J-S09004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :          PENNSYLVANIA
                                          :
            v.                               :
                                          :
                                          :
ENOS J. HERSHBERGER             :
                                          :
              Appellant                  :      No. 187 WDA 2022

Appeal from the Judgment of Sentence Entered December 22, 2021
In the Court of Common Pleas of Jefferson County Criminal Division at
No(s): CP-33-CR-0000548-2020

BEFORE: BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:         **FILED: JUNE 14, 2023**

Appellant, Enos J. Hershberger, appeals from the December 22, 2021 judgment of sentence of 140-280 years' incarceration, imposed after a jury convicted him of five counts of Rape, 18 Pa.C.S. § 3121(a)(1); three counts of Involuntary Deviate Sexual Intercourse ("IDSI"), 18 Pa.C.S. § 3123(a)(7); forty-eight counts of Statutory Sexual Assault, 18 Pa.C.S. § 3122.1(b); forty-eight counts of Incest, 18 Pa.C.S. § 4302; eight counts of Aggravated Indecent Assault, 18 Pa.C.S. § 3125(a)(8); forty-eight counts of Sexual Assault, 18 Pa.C.S. § 3124.1; five counts of Endangering the Welfare of Children, 18 Pa.C.S. § 4304(a)(1); and four counts of Indecent Assault, 18 Pa.C.S. § 3126(a)(8). After review, we affirm.

Appellant summarized the facts adduced at his jury trial as follows:

[L.M.] is the daughter of [Appellant] and [E.H. S]he was born on February 8, 1994. As a child, [L.M.] lived with her parents and, as they were born, her fifteen (15) younger siblings in Amish

communities. On or about August 26, 2006, when she was twelve (12) years old, [L.M.] and her family moved into a house on Route 119, near Sykesville, PA. On August 28, 2006, she began school. Around this time, in the middle of the night, [Appellant] came into her bedroom and had sexual intercourse with her. During this encounter, she acted as if she was sleeping, and she did not understand what was happening. This was the first time she had sexual intercourse with [Appellant]; she approximated that it happened sometime between August 28, 2006, and September 14, 2006.

After this began, [L.M.] believed that it continued to happen two (2) to three (3) times per week. During this time, she believed that what was happening was normal, because [Appellant] had told her it was normal. On one Sunday afternoon, while the rest of her family was outside playing and she was in her room taking a nap, [Appellant] came up to her bedroom and the two of them had sexual intercourse. At this time, [Appellant] told [L.M.] that she was not allowed to tell her mom and that it is okay for fathers and daughters to have sex.

On a few occasions, [Appellant] would take [L.M.] to the chiropractor[,] and then on the way home[,] he would have her sit on his lap and have sexual intercourse in the buggy. This happened "about four or five times." [L.M.] said that this happened before she knew it was wrong.

One evening, in the fall of 2007, [L.M.] was canning sweet corn with her family, and it was time for bed. Everyone went to bed except for [L.M.] and [Appellant]. [E.H. — L.M.'s mother and Appellant's wife —] was [lying] on the couch. [L.M.] came into the living room and sat on her mother's rocker handle. [Appellant] came over to her and put his fingers on her vagina. At that time[, E.H.] sat up and stated, "[S]o this is what's going on." [Appellant] stated that no, this was the first time. [E.H.] asked [L.M.] if that was the case[,] and [L.M.] said no[,] and [E.H.] began to cry.

After this, [L.M.] remembers these encounters happening more often, "pretty much every night," mostly in the same way it happened the first time in the middle of the night. One time, in the middle of the night, [Appellant] came up into her bedroom[,] and [L.M.] tried to fight him off and push him back. [Appellant] then struck her with his open hand and then had sexual intercourse with her. After he had struck her[,] she stopped resisting. [L.M.] told her mother … the next day[ that Appellant

had hit her; L.M.] knew this because the following night [Appellant] came up and said to her "we'll see if you are so good that you can't feel anything," and he struck her face again one time and then had sexual intercourse with her.[1] There were only two (2) occasions where [Appellant] hit [L.M.] prior to sexual intercourse.

Other times, [L.M.] tried to push [Appellant] away with her hands and/or feet[,] or tried to put her hand in front of her vagina, but [Appellant] would grab her hands and pin them beside her on the bed[,] and then have sexual intercourse with her. Although this happened sometimes, [L.M.] did not resist [Appellant] often, so that it would be over sooner.

One time, in the early morning, [L.M.] got up to get [Appellant's] lunch box and went out to the bathroom. She saw [Appellant] as he came out of the washhouse, and he wanted to have sex. She asked him to please not do it because she was worried she was pregnant because she was late for her period. [Appellant] then took her into the bathroom, told her to bend over the toilet[,] and he had sexual intercourse in her anus.

One time, [L.M.] heard [Appellant] coming up the stairs and when he crawled on the bed, she pushed him off and ran out of her bedroom and down to the kitchen toilet. She then went back up to her bedroom to change[,] and [Appellant] came out from under her bed and said that he tricked her. However, there was no sexual encounter at that time because her siblings were awake.

Another morning, [L.M.] heard [Appellant] coming up and she pushed him away and ran to the kitchen. As she was going to walk back up the stairs, [Appellant] came out from behind the wall, and they had sexual intercourse.

On a few other occasions, [Appellant] wanted [L.M.] to do chin-ups. So, she put her hands up on the chin-up bar and would do

---

[1] For more context, L.M. testified that, the first time Appellant hit her face with his hand, she "saw stars" but "didn't feel anything." N.T. Trial, 5/20/21, at 58. The next day, L.M. said that she told her mother about being hit because L.M. "was wondering why didn't I feel anything when I saw stars." *Id.* at 59. L.M. concluded that her mother must have told Appellant about what L.M. had said about not feeling anything when he hit her because, the next night, Appellant said, "We'll see if you are so good that you can't feel anything." *Id.*

chin-ups, then, [Appellant] would help her get her legs over the chin-up bar and hang down. At this point, [Appellant] would sometimes lick her vagina and sometimes put his finger into her vagina. This happened over a period of "about a month[.]" [L.M.] recalled on direct examination that [Appellant] licked her vagina approximately three times[,] and when asked how many times [Appellant] used his finger, [L.M.] stated, "a couple times" and then "[f]ive times, four or five times." When asked again regarding how many times [Appellant] used his tongue, [L.M.] stated[,] "I know it wasn't often, but I can't correctly remember positively exactly how many times it happened." Then she stated "it was — I know it was at least one time. It was one to three times, something like that." On some of the occasions when [L.M.] came down from the chin-up bar[, she and Appellant] … had sexual intercourse on the floor.

On[e] time, while her mother was in the hospital, [Appellant] came into her room and she fought him off[. H]e went back into the living room and then he came back in and had her [lie] on the edge of the bed while he fingered her and ejaculated[. H]e did this while holding a stick. Later that night or early the next morning, [L.M.] woke up to [Appellant's] having sexual intercourse with her.

One evening, [Appellant] went up to [L.M.'s] room and said he had no love for her and said she was naughty. Later that same night, he came back to her room and apologized and said he was sorry he said that. After his apology, [Appellant] and [L.M.] had sexual intercourse.

In the winter when [L.M.] was sixteen (16)[,] these encounters no longer happened. [L.M.] did not know why it stopped, she figured that it may have been because she was going to "take the baptismals." She started lessons with the bishops and deacons in May of 2011.

In February, 2020, Senior Deputy Attorney General Patrick Schulte[] was conducting an interview of Melissa Leseman in Punxsutawney regarding a different investigation.[2] Ms. Leseman disclosed to Attorney Schulte that she had knowledge of [L.M.'s] having sexual relations with her father, [Appellant]. Based on this information, on February 11, 2020, Attorney Schulte made a

---

[2] L.M. explained at trial that she now has children, and that Ms. Leseman was L.M.'s midwife for one of them. N.T. Trial, 5/20/21, at 82.

- 4 -

report of suspected child abuse to Child Protective Services. This report was disseminated to the Pennsylvania State Police and the Jefferson County District Attorney's Office.

Shortly after that, Pennsylvania State Trooper Michael J. D'Andrea came to see [L.M.] and ask[ed] about her and her father, [Appellant]. This was the first time [L.M.] was aware that anyone from the "outside English world" knew about what had happened when she was younger. Trooper D'Andrea told [L.M.] about [Ms.] Leseman disclosing to the attorney general what she knew about [L.M]. [L.M.] never recalled disclosing these events to [Ms.] Leseman.

Shortly after meeting Trooper D'Andrea, [L.M.] was interviewed by Trooper D'Andrea. Trooper D'Andrea interviewed [L.M.] on August 17, 2020[,] and again on October 28, 202[0]. Trooper D'Andrea learned that [L.M.] had received voicemails from [Appellant] that were left on her answering machine in Dutch. After some time doing investigation, Trooper D'Andrea conducted a videotaped interview of [Appellant] on October 19, 2020.[3] After the interview, [Appellant] was detained, charged, and taken to the Jefferson County Jail for a video arraignment.

Appellant's Brief at 28-34 (internal citations and footnotes omitted).

_____

[3] This videotaped interview was entered as an exhibit at trial, but was not transmitted to us with the record. **See** Pa.R.A.P. 1931 (stating that the record on appeal, including the transcripts and exhibits necessary for the determination of the appeal, shall be transmitted to the appellate court); **see also Commonwealth v. Shreffler**, 249 A.3d 575, 584 (Pa. Super. 2021) ("It is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal.") (citation omitted). Based on our review of the record, however, we are able to glean that Appellant admitted to certain allegations in the videotaped interview with Trooper D'Andrea. **See** N.T. Trial, 5/21/21, at 75 (defense counsel acknowledging in his closing argument that, in the video of Trooper D'Andrea interviewing Appellant, Appellant "admitted to five or six of these allegations"); **id.** at 104-06 (the Commonwealth's stating, in its closing argument, that Appellant admitted in the videotaped interview that he had sexual intercourse with L.M., but that it only happened about 5 times, and that he had already been shunned for a time by the Amish community for doing so).

A jury convicted Appellant of the above-stated offenses, and the trial court sentenced him to the aggregate term of incarceration set forth *supra*. Appellant filed a timely, post-sentence motion, which the trial court denied. Appellant subsequently filed a timely notice of appeal. The trial court instructed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) no later than 21 days from the date of his receipt of the transcript, and he timely complied. The trial court then issued a Rule 1925(a) opinion.

On appeal, Appellant presents seven questions for our review:

I. Is the evidence of record insufficient as a matter of law to support [Appellant's] conviction at 3 out of the 5 counts of Rape; Forcible Compulsion where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] forcibly compelled the victim to have sexual intercourse by using physical force, threatening to use physical force, or engaging in psychological coercion to achieve it as to those three counts?

II. Is the evidence of record insufficient as a matter of law to support [Appellant's] conviction at 1 out of the 3 counts of [IDSI] where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] engaged in deviate sexual intercourse with the victim who was less than 16 years of age and was not married to [Appellant,] and [Appellant] was four or more years older than the victim as to that count?

III. Is the evidence of record insufficient as a matter of law to support [Appellant's] conviction for 40 out of the 48 counts of Statutory Sexual Assault where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] engaged in sexual intercourse with the victim to whom [Appellant] was not married and who was under the age 16[,] and [Appellant] was 11 years or more older than the victim as to those 40 counts?

IV. Is the evidence of record insufficient as a matter of law to support [Appellant's] conviction for 40 out of the 48 counts of Incest where the Commonwealth failed to prove beyond a

reasonable doubt that [Appellant] had sexual intercourse with the victim, his daughter, as to those 40 counts?

V. Is the evidence of record insufficient as a matter of law to support [Appellant's] conviction for 40 out of the 48 counts of Sexual Assault where the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] engaged in sexual intercourse or deviate sexual intercourse with the victim without the victim's consent, as to those 40 counts?

VI. Did the trial court commit a reversible error when it denied [Appellant's] motion for mistrial?

VII. Did the sentencing court manifestly abuse its discretion and sentence [Appellant] to a manifestly excessive sentence of one hundred forty (140) years to two hundred eighty (280) years?

Appellant's Brief at 21-23.

### I.

In Appellant's first issue, he claims that the evidence was insufficient to support his convictions at three of the five counts of rape under 18 Pa.C.S. § 3121(a)(1). Section 3121(a)(1) sets forth that "[a] person commits a felony of the first degree when the person engages in sexual intercourse with a complainant … [b]y forcible compulsion." 18 Pa.C.S. § 3121(a)(1).[4] To prove "the 'forcible compulsion' component, the Commonwealth must establish, beyond a reasonable doubt, that the defendant 'used either physical force, a threat of physical force, or psychological coercion, since the mere showing of a lack of consent does not support a conviction for rape … by forcible compulsion.'" *Commonwealth v. Eckrote*, 12 A.3d 383, 387 (Pa. Super.

---

[4] "Sexual intercourse" is defined, "[i]n addition to its ordinary meaning," as "includ[ing] intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S. § 3101.

2010) (citation omitted). "Further, the degree of force required to constitute rape is relative and depends on the facts and particular circumstances of a given case." *Id.* (citations omitted).

Appellant argues that, "[o]utside of the two instances in which [L.M.] testified that [Appellant] hit her prior to engaging in sexual intercourse with her, the Commonwealth failed to present sufficient evidence of forcible compulsion." Appellant's Brief at 41. Appellant points out that L.M. "testified that she rarely resisted, and that she would purposefully not resist so it would 'be over sooner.'" *Id.* at 42 (citing N.T. Trial, 5/20/21, at 61). Appellant acknowledges that L.M. testified that there were other times when she resisted having sexual intercourse, but he claims that "there was not a sufficient factual basis for these incidents. She doesn't state when they happened or how many times." *Id.* Appellant also complains that, on cross-examination, L.M. indicated that the times she fought Appellant off were the times he hit her, and Appellant notes that L.M. only testified to being hit twice. *Id.* Thus, Appellant asserts that "[t]he Commonwealth charged [Appellant] with five (5) counts of rape, but at no point sufficiently establishe[d] the three times other than when [Appellant] hit [L.M.] that these rapes occurred." *Id.*

> It is well-established that,
>
> [w]hen reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the

province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Steele*, 234 A.3d 840, 845 (Pa. Super. 2020) (cleaned up).

At trial, L.M. testified:

[The Commonwealth:] Okay, [L.M.], were there other times [besides the two times Appellant hit you] that you resisted having sexual intercourse with him?

[L.M.:] Yes.

[The Commonwealth:] And describe the ways that you would resist.

[L.M.:] Mostly just pushed him away with my hands and, if I could, with my feet, and most of the time, he would grab my hands and pin them beside me on the bed.

[The Commonwealth:] And after he would pin your hands beside you on the bed, what would he do?

[L.M.:] Have sexual intercourse.

[The Commonwealth:] Did you ever try to block him?

[L.M.:] Yes.

[The Commonwealth:] How would you do that?

[L.M.:] Put my hand in front of my vagina.

[The Commonwealth:] Now, [L.M.], you didn't resist often, though, did you?

[L.M.:] No.

[The Commonwealth:] Why not?

[L.M.:] So it would be over sooner.

[The Commonwealth:] So about how many times would you say you put up resistance?

[L.M.:] Six, seven times, something like that.

***

[Appellant's counsel:] You had indicated there were times where you would try to fight [Appellant] off?

[L.M.:] Yes.

[Appellant's counsel:] And that would have been on Shoe Road?

[L.M.:] Yes.

[Appellant's counsel:] And would you fight him -- I think you said you would fight him off by pushing at him with your hands and sometimes your feet?

[L.M.:] Yes.

[Appellant's counsel:] And when you were fighting him off, would those be times when he would hit you?

[L.M.:] Yes.

N.T. Trial, 5/20/21, at 60-61, 117.

Because of the above-stated testimony, we reject Appellant's argument. Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, L.M.'s testimony establishes that, in addition to the two times when Appellant hit her, L.M. tried to physically resist Appellant **at least** three other times. **See Steele**, **supra**; **see also Commonwealth v. Cramer**, 195 A.3d 594, 602 (Pa. Super. 2018) ("[T]he uncorroborated testimony of the complaining witness is sufficient to convict a defendant of sexual offenses.") (citation omitted). The fact that L.M. did not describe these other instances of resistance in detail does not negate that she testified that they occurred, and the jury apparently credited such testimony. Moreover, to the extent

- 10 -

Appellant avers that L.M.'s cross-examination testimony implies that she only fought Appellant off the two times he hit her, we note that "[i]t is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence." **Steele**, **supra**. As the Commonwealth discerns, the jury may have reasonably interpreted L.M.'s cross-examination testimony to mean that the times she fought Appellant off **included** the times he hit her, instead of that the only times she fought him off were the times he hit her. **See** Commonwealth's Brief at 6. Therefore, based on the foregoing, no relief is due on Appellant's first issue.

## II.

In Appellant's second issue, he argues that the evidence was insufficient to support his conviction as to one of the three counts of IDSI. He says that "[t]he Commonwealth's evidence did not prove beyond a reasonable doubt that there was a second occasion of anal or oral sex between [Appellant] and [L.M]." Appellant's Brief at 43.

Section 3123(a)(7) provides that "[a] person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant … who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other." 18 Pa.C.S. § 3123(a)(7). "Deviate sexual intercourse" is defined as:

> Sexual intercourse per os or per anus between human beings and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of

- 11 -

another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures.

18 Pa.C.S. § 3101.

Here, L.M. testified that Appellant had anal sex with her once. N.T. Trial, 5/20/21, at 61-62. In addition, on direct examination, L.M. stated that Appellant had licked her vagina on three occasions while she was hanging from a chin-up bar, detailing:

> [L.M.:] Well, [Appellant] wanted me to do chin-ups. He said something about strengthening my stomach muscles or something, and I would take both my hands up on the chin-up bar and do a couple chin-ups. And then he would help me get my legs over the chin-up bar and then hang down.
>
> [The Commonwealth:] So, [L.M.], just so we can get an idea of this, you'd be suspended from the chin-up bar with your legs draped over the bar, and your … rear[-]end would be hanging down?
>
> [L.M.:] Yes.
>
> [The Commonwealth:] Okay. Go ahead.
>
> [L.M.:] And then sometimes he would lick my vagina. And sometimes he would put his finger in it.
>
> [The Commonwealth:] While you were hanging from the chin-up bar?
>
> [L.M.:] Yes.
>
> [The Commonwealth:] … [H]ow long did he have you going down to do chin-ups? Over what period of time was that?
>
> [L.M.:] About a month.
>
> [The Commonwealth:] Okay. And during that time, you said he would lick your vagina. Do you know approximately how many times that happened?
>
> [L.M.:] Three times.

*Id.* at 66-67.

Later on cross-examination, however, L.M. stated that she could not remember exactly how many times Appellant used his tongue on her, stating:

[Appellant's attorney:] I will ask, though, [L.M.], do you recall telling Trooper D'Andrea that [Appellant] used his tongue one time?

[L.M.]: I know it wasn't often --

[Appellant's attorney:] I'm sorry?

[L.M.]: I know it wasn't often, but I can't correctly remember positively exactly how many times it happened.

[Appellant's attorney:] Okay. So you said earlier it was three times, but you're indicating now you don't remember how many times?

[L.M.]: It was -- I know it was at least one time. It was one to three times, something like that.

*Id.* at 116.

Again, when reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the Commonwealth as the verdict winner, and we reiterate that "[i]t is within the province of the fact-finder to determine the weight to accord to each witness's testimony and to believe all, part or none of the evidence." **See Steele**, **supra**; **see also Cramer**, 195 A.3d at 602 ("[T]he uncorroborated testimony of the complaining witness is sufficient to convict a defendant of sexual offenses.") (citation omitted). Here, the jury could credit L.M.'s initial testimony on direct examination that Appellant had licked her vagina three times. Therefore, the evidence of

multiple instances of oral sex — in addition to the one occurrence of anal sex — was sufficient to support Appellant's conviction as to three counts of IDSI.[5]

## III.

In Appellant's third issue, he contends that the evidence does not support his convictions at 40 of the 48 counts of statutory sexual assault under 18 Pa.C.S. § 3122.1(b). Section 3122.1(b) states:

> A person commits a felony of the first degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is 11 or more years older than the

---

[5] Included in Appellant's sufficiency argument is a claim that the Criminal Information stated that **two** instances of anal sexual intercourse and **one** instance of oral sexual intercourse took place. Appellant's Brief at 43-44. However, Appellant says that the Commonwealth concedes that only one instance of anal sexual intercourse occurred and, that as a result, we must vacate one count of IDSI. **See id.** at 44 ("[T]he Commonwealth concedes that there is only one instance of anal sex. Count seven and count eight [of the Information] allege anal sex as the reason for the charge. As such, this Court must vacate one count of IDSI that [Appellant] was found guilty of."). As Appellant has waived this claim, no relief is due.

First, Appellant's Criminal-Information argument is distinct from his sufficiency argument, and Appellant did not raise his Criminal-Information claim in his Statement of the Questions Involved. Accordingly, it is waived. **See** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); **see also Commonwealth v. Sanchez**, 36 A.3d 24, 42 (Pa. 2011) ("[The a]ppellant claims that the discrepancy between the Information and the evidence introduced at trial, *i.e.*, the *allegata* and the *probata*, entitles him to sufficiency relief. … This is not a sufficiency issue, but a discrepancy issue.") (footnote omitted). Second, Appellant did not raise this specific Criminal-Information claim in his Rule 1925(b) concise statement. Thus, it is waived on this basis, as well. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Trial Court Order, 2/14/22 ("Any issue not properly included in this statement, timely filed with the Prothonotary, and served on the trial judge … shall be waived.") (single page).

complainant and the complainant and the person are not married to each other.

18 Pa.C.S. § 3122.1(b).

Appellant explains that, at counts 9-56, he was convicted of statutory sexual assault under Section 3122.1(b). *See* Appellant's Brief at 45. According to Appellant, the Commonwealth represented at trial that it charged 48 counts based on 1 count per month for 4 years. *Id.* However, Appellant complains that L.M. only testified to 9 specific instances of statutory sexual assault. *Id.* Other than these 9 specific instances, Appellant says that the evidence was insufficient to establish that this crime occurred once per month for 4 years. *Id.*

> We disagree. As the Commonwealth sets forth:

> L.M. testified that the subject sexual abuse began in the fall of 2006 and that, after it started and before her mother witnessed an instance of it, it was happening two to three times per week. [N.T. Trial, 5/20/21, at 53]. The Information charges the relevant conduct between January 1, 2007 and December 31, 2012. L.M.'s testimony established that her mother caught [Appellant] in the act of touching her sexually in the fall of 2007. Thus, according to L.M.'s testimony regarding the frequency of these assaults, over seventy sexual assaults had already occurred by this time. L.M. would have only been 13 in the fall of 2007. After her mother caught [Appellant] in the act, the frequency of the assaults increased to "[p]retty much every night" except for times when she was menstruating. N.T. [Trial], 5/20/[]21, [at] 57.

> Accordingly, the Commonwealth proved far more counts than the mere forty-eight which were charged.

Commonwealth's Brief at 10.

As the Commonwealth discerns, L.M.'s testimony that Appellant had sexual intercourse with her 2-3 times per week through the beginning of 2007,

- 15 -

and nearly every day when she was not menstruating beginning in the fall of 2007 and continuing through 2012, supports Appellant's convictions for 48 counts of statutory sexual assault. Accordingly, Appellant's third issue warrants no relief.

## IV.

In Appellant's fourth issue, he argues that the evidence was insufficient to support his convictions at 40 of the 48 counts of incest, for the same reasons advanced in support of his third issue. *See* 18 Pa.C.S. § 4302. For the reasons we rejected Appellant's third issue, we also reject his fourth issue.

## V.

In Appellant's fifth issue, he likewise claims that the evidence is insufficient to support his convictions at 40 of the 48 counts of sexual assault, for the same reasons presented in his third and fourth issues. *See* 18 Pa.C.S. § 3124.1. For the reasons Appellant's third and fourth issues fail, this issue also fails.

## VI.

In Appellant's sixth issue, he asserts that the trial court committed reversible error when it denied his motion for a mistrial. Appellant provides the following background on this issue:

> On May 20, 2021, [Appellant] proceeded to a jury trial…. During the trial, after [L.M.] had testified and after the Affiant, Trooper … D'Andrea[,] had gone through his direct examination by the Commonwealth, [Appellant's trial counsel] requested a recess to discuss a discovery issue. [Appellant's trial counsel] informed the trial court that he was missing materials that should have been disclosed in discovery. Specifically, [Appellant's trial counsel]

- 16 -

stated that the defense only received sixty (60) or so pages of discovery[,] and that the Commonwealth had a file of three[-]hundred (300) or so. Through discussion, it was found that [Appellant's trial counsel] had never received the victim's medical records.[6, 7] [Appellant's trial counsel] raised many concerns[,] including that he may not have subpoenaed necessary witnesses, that there may have been evidence in the medical records that would have been helpful to a defense in this matter or evidence that would have changed [Appellant's] decision to go to trial or not, and that he may have not adequately cross-examined [L.M]. The trial court recessed the case for the evening to allow [Appellant's trial counsel] to have the night to review the medical records.

The next morning, Friday, May 21, 2021, [Appellant's trial counsel] made a motion for mistrial, because he received a large packet of discovery at approximately 4:00 p.m., on Thursday, May 20, 2021, after trial had begun, the jury had been sworn, and the victim had testified.[8] [Appellant's trial counsel] noted that there was a section of approximately 40 pages that dealt with [L.M.'s] psychiatric admission that could have been important for trial purposes and additionally[] that [Appellant] was not able to

_____

[6] The Commonwealth explains that it obtained L.M.'s medical records because, "[d]uring pre-trial preparations, L.M. talked about a surgical procedure that she had when she was young and that she knew the abuse preceded that surgery." Commonwealth's Brief at 12. In trying to determine the date of this surgery, the Commonwealth says that the investigating officer received "a huge download of L.M.'s medical records spanning years." *Id.* The Commonwealth states that it received those records from the investigating officer on May 17, 2021, and forwarded them via email to defense counsel that same day out of an abundance of caution. *Id.* However, the Commonwealth conveys that, because the records contained sensitive health information, the email was automatically encrypted by the county's email server. *Id.* *See also* N.T. Trial, 5/20/21, at 141-42, 144-46 (detailing why the Commonwealth sought L.M.'s medical records and explaining that the email was encrypted). For whatever reason, Appellant's trial counsel did not receive these medical records. *Id.* at 141-42.

[7] These medical records were not admitted into evidence.

[8] The Commonwealth ensured that L.M. was available for the second day of trial in case Appellant sought to recall her. N.T. Trial, 5/20/21, at 146-47. Appellant did not seek to do so. N.T. Trial, 5/21/21, at 10.

- 17 -

review this discovery before rejecting the plea agreement and proceeding to trial. The trial court denied [Appellant's] motion for mistrial.

Appellant's Brief at 25-26 (internal citations omitted).

Appellant argues that "the lack of time to review the medical records, and the lack of opportunity to have a defense expert review the records[,] was a prejudicial event that deprived [Appellant] of a fair trial." *Id.* at 51. He complains that he did not have the opportunity to review the records with his attorney, and states that he and his counsel may have been able to craft a different defense upon review of these records by their own expert. *Id.* Additionally, Appellant posits that a review of the medical records "may have influenced [his] decision of whether to plea or go to trial." *Id.* at 52.

Pennsylvania Rule of Criminal Procedure 605(B) provides that "[w]hen an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial[.]" Pa.R.Crim.P. 605(B). Further, "[a] trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. A motion for a mistrial is a matter addressed to the discretion of the court." *Commonwealth v. Jones*, 668 A.2d 491, 502-03 (Pa. 1995) (citations omitted).

Here, the trial court denied Appellant's request for a mistrial, opining:

[A] mistrial was not warranted. There is no question that defense counsel did not have access until the afternoon of the first day of trial to a large volume of medical records related to the victim. There is also no question that he was able to review them before trial commenced the following morning and *did not identify any way in which they would have altered his defense, though*.

- 18 -

His only concern was that [Appellant], had he had the opportunity to review some of the records, would have decided to plead guilty rather [than] proceed to trial. Especially when there was no claim or evidence of a ***Brady***[9] violation, though, such a speculative concern was not a basis for a mistral.

Trial Court Opinion ("TCO"), 6/24/22, at 3 (internal citation omitted; emphasis added).

We agree with the trial court's analysis, especially with respect to Appellant's inability to identify any way in which the documents would have altered his defense or made him accept a plea agreement. Appellant does not ***specifically*** articulate how anything in the medical records would have influenced him to plead guilty, assisted with or hindered his defense, or otherwise caused him prejudice. ***Accord*** Commonwealth's Brief at 13 ("[Appellant] makes this general, vague, and spurious claim on appeal without pointing to anything specific that would have changed had he had the material earlier.").[10] As such, we conclude that the trial court did not abuse its

---

[9] ***Brady v. Maryland***, 373 U.S. 83, 87 (1963); ***see also Commonwealth v. Bagnall***, 235 A.3d 1075, 1085-86 (Pa. 2020) ("It is well-settled that ***Brady*** and subsequent precedent flowing therefrom imposes upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. This Court has held that, to establish a ***Brady*** violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued.") (citations omitted).

[10] The Commonwealth persuasively points out that, by the time Appellant filed his post-sentence motion, he had possessed all of the subject discovery for over seven months. Commonwealth's Brief at 13. Nevertheless, the

discretion in denying Appellant's motion for a mistrial, as he does not demonstrate how his late receipt of L.M.'s medical records deprived him of a fair and impartial trial.

## VII.

In Appellant's seventh and final issue, he asserts that the trial court abused its discretion in sentencing him to a manifestly excessive sentence of 140-280 years' imprisonment. *See* Appellant's Brief at 52. While Appellant concedes that the trial court's sentence was within the statutory limits and the sentencing guidelines, *id.* at 37, he claims that the trial court failed to consider his rehabilitative needs, his lack of prior record, and his support in the community when sentencing him, and instead acted with ill-will and focused only on the seriousness of Appellant's crimes. *Id.* at 37, 52-53. He also complains that that trial court "went far above the recommended sentence from the pre-sentence investigation report ("PSI")[,] which recommended a

---

Commonwealth remarks that Appellant "did not raise a single issue involving the allegedly missing discovery [in his post-sentence motion], how it could have influenced him to plead guilty, how it would have helped his defense, other witnesses he could have called, or how not having the material prejudiced him in any way." *Id.* According to Commonwealth, "[A]ppellant could have asked for a new trial based on some great find within this discovery but did not." *Id.*

In addition, the Commonwealth also convincingly notes that "nothing in the subject medical records would have compelled [Appellant] to plead guilty inasmuch as the Commonwealth did not admit any evidence from them. There was no evidence utilized by the Commonwealth flowing from these records that was damaging to the defense." *Id.* at 14. Similarly, the Commonwealth underscores that "the defense did not seek to admit anything that was purportedly beneficial to them." *Id.*

sentence of 38 years[-]and[-]9 months to 77 years[-]and[-]6 months." ***Id.*** at 53 (citation omitted). Finally, Appellant contends that running each count consecutively was contrary to the fundamental norms underlying the sentencing process and inconsistent with the objectives of the Sentencing Code, as the trial court's reasons for doing so were not supported by the record. ***Id.*** at 53-54. Specifically, Appellant states that the trial court said it was running the sentences at Counts 9-56 consecutively because each was a separate incident that L.M. testified to, but Appellant maintains that "[a]t no point in time during trial did [L.M.] testify to 48 separate incidents." ***Id.*** at 54.

Appellant's claims implicate the discretionary aspects of his sentence.

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. ***Commonwealth v. Sierra***, 752 A.2d 910, 912 (Pa. Super. 2000). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006), *appeal denied*, … 909 A.2d 303 ([Pa.] 2006). Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or in a motion to modify the sentence imposed. ***Commonwealth v. Mann***, 820 A.2d 788, 794 (Pa. Super. 2003), *appeal denied*, … 831 A.2d 599 ([Pa.] 2003).

- 21 -

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. ***Commonwealth v. Paul***, 925 A.2d 825, 828 (Pa. Super. 2007). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." ***Sierra***, ***supra*** at 912–13.

***Commonwealth v. Griffin***, 65 A.3d 932, 935 (Pa. Super. 2013) (quoting

***Commonwealth v. Moury***, 992 A.2d 162, 170 (Pa. Super. 2010)).

Here, the record reflects that Appellant filed a timely notice of appeal and included a Rule 2119(f) statement in his appellate brief in compliance with our Rules of Appellate Procedure. In addition, he filed a timely post-sentence motion, in which he asserted that his consecutive sentences were excessive, and that the trial court focused on the seriousness of his offenses while not considering mitigating factors, Appellant's rehabilitative needs, his lack of prior record, and the support he has from his community. Problematically, however, Appellant did not raise in his post-sentence motion or at sentencing his claims that the trial court acted with ill-will in sentencing him, and that the record did not support the trial court's reasoning for imposing consecutive sentences at Counts 9-56. Thus, those aspects of his discretionary-sentence issue are waived.[11]

---

[11] Appellant also did not raise these specific claims in his Rule 1925(b) statement. ***See*** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Trial Court Order, 2/14/22 ("Any issue not properly included in this statement, timely filed with the Prothonotary, and served on the trial judge … shall be waived.") (single page).

With respect to Appellant's preserved claims, we conclude that they raise substantial questions to meet the fourth requirement of the four-part test set forth above. *See Commonwealth v. Caldwell*, 117 A.3d 763, 770 (Pa. Super. 2015) (*en banc*) (concluding that "[the a]ppellant's challenge to the imposition of his consecutive sentences as unduly excessive, together with his claim that the court failed to consider his rehabilitative needs upon fashioning its sentence, presents a substantial question"); *Commonwealth v. Swope*, 123 A.3d 333, 340 (Pa. Super. 2015) ("[W]e conclude that [the a]ppellant's challenge to the imposition of his consecutive sentences as unduly excessive, together with his claim that the court failed to consider his rehabilitative needs and mitigating factors upon fashioning its sentence, presents a substantial question."). Accordingly, we will review the merits of Appellant's preserved claims.

> In reviewing the merits, we keep in mind the following:

> The Sentencing Code provides that "the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.[] § 9721(b). The trial court has discretion within legal limits when sentencing a defendant, and absent an abuse of that discretion, we will not disturb its sentence. *Commonwealth v. Perry*, … 32 A.3d 232, 236 ([Pa.] 2011). An abuse of discretion occurs where "the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* (quoting *Commonwealth v. Walls*, 926 A.2d 957, 961 ([Pa.] 2007)). The sentencing judge does not have to give a "lengthy discourse" explaining its reasons for imposing a sentence. *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa.Super. 2010). However, "the record as a whole must reflect the sentencing court's

consideration of the facts of the crime and character of the offender." *Id.*

***Commonwealth v. Rominger***, 199 A.3d 964, 970 (Pa. Super. 2018).

The trial court explained its reasoning for the sentence it imposed on

Appellant, as follows:

[Appellant] claims that his sentence was manifestly excessive, [with] the [c]ourt['s] having emphasized the seriousness of his crimes without giving appropriate consideration to mitigating factors and his rehabilitative needs. The record tells a different story.

The [c]ourt had and reviewed a copy of [Appellant's] PSI report before it sentenced him. Between that and the witnesses who supported him at trial and sentencing, it was well aware and acknowledged that he had a strong work ethic, financially supported his immediate family, was supportive of his extended family in various ways, and had the support of his family and the community of which he was a member. That did not mitigate the heinousness of what he did behind closed doors, though, and the [c]ourt articulated as much on the record.

[Appellant] knew what he did was wrong, which is why he offered a highly edited confession to his bishop. He did not "mess up" one time and thereafter amend his behavior, though. He persisted for years, even after being discovered by his wife, in violating his own daughter, doubtlessly secure in the belief that his esteemed reputation[,] and common customs and practices within the Amish community[,] would protect him from any real consequences. And he would have been correct had the victim's former mid-wife not revealed the truth during a separate police investigation.

Even after his actions were brought to light, [Appellant] responded with lies, vitriol, and attempts to intimidate his daughter. She was a willing and eager participant, he told the police. She was hurting her mother and siblings, would never receive forgiveness, and was doomed to hell if she pursued her prosecutorial course of action, he told her in phone messages. Even after admitting during a police interview to having sex with his daughter — albeit not to the extent to which she testified — and being found guilty, moreover, [Appellant] continued to make his victim the villain, his only colloquy-like comment during the sentencing hearing being, "[A]nd I don't understand — the worst part that I can't understand

- 24 -

is how you can press charges that the person didn't even do, how you can press charges on somebody like that."

All of that — the plain evidence of a depraved mindset — informed the [c]ourt that a laudable work ethic and strong family ties and community support did not weigh against the need to protect society from a man who continued to proclaim his innocence and denigrate his victim, who was his own teenage daughter, in the face of incontrovertible proof — his own admission — that he had sex with her. Of the Amish faith, his release back into society would afford him access to myriad adolescent girls in an environment with little oversight or accountability, and that was not something the [c]ourt was willing to risk just because [Appellant] was a hard worker with strong community support and no criminal history.

While, as a practical matter, [Appellant's] sentence does not allow for his release, … it is not manifestly excessive under the circumstances. [Despite Appellant's] suggestion to the contrary, the [c]ourt did consider all relevant sentencing factors, which included a **lack** of remorse and **failure** to accept responsibility, and concluded that the most appropriate sentence under the circumstances was one that would keep him separated from **any** Amish or other community for the rest of his natural life.

TCO at 3-5 (internal citations omitted; emphasis in original).

We conclude that the trial court did not manifestly abuse its discretion in sentencing Appellant. Counter to Appellant's argument, it is evident that the trial court considered the protection of the public, the gravity of the offense as it relates to the impact on the life of L.M. and on the community, and the rehabilitative needs of Appellant. *See* 42 Pa.C.S. § 9721(b). While the trial court acknowledged Appellant's lack of prior criminal history and the support he has in his community, it reasoned that the need to protect society and the heinousness of his offenses with respect to L.M. outweighed those

considerations.[12]  The trial court also noted Appellant's lack of remorse and cogently explained that it imposed a sentence that would keep Appellant incarcerated and separated from the Amish community for the rest of his life, in an effort to protect other adolescent girls there.[13]  Based on the foregoing, we discern that the trial court did not manifestly abuse its discretion in sentencing Appellant and, therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

_____

[12] We also point out that the trial court stated it reviewed Appellant's PSI prior to sentencing him, and note that, "where the sentencing judge had the benefit of a [PSI] report, it will be presumed that he or she was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." **Commonwealth v. Boyer**, 856 A.2d 149, 154 (Pa. Super. 2004) (citation omitted).

[13] Even if we were to address Appellant's waived discretionary-aspect-of-sentencing claims, we would determine no relief is due.  First, for the reasons set forth *supra*, the record demonstrates that the trial court reasonably weighed the appropriate sentencing factors, and consequently, we would not conclude that the trial court abused its discretion by allegedly acting with ill-will toward Appellant at sentencing, when it observed that "no person who's ever entered this courtroom, even those who [have] killed other people, have earned a sentence more than you have."  Appellant's Brief at 52-53 (quoting N.T. Sentencing, 12/21/21, at 81).  Second, with respect to Appellant's claim that the trial court should not have imposed consecutive sentences at Counts 9-56 because L.M. did not testify to each incident separately, as the trial court represented at sentencing, we would also conclude that this claim fails.  While L.M. did not provide details for 48 separate incidents, she did testify as to the frequency of the sexual encounters, which amounted to far more than 48 separate incidents.  **See** Issues III-V, **supra**.  Accordingly, we would determine that the trial court did not abuse its discretion in imposing consecutive sentences at these counts, as there is a basis in the record for its finding that each was a separate incident about which L.M. testified.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

DATE: 6/14/2023